Your argument next in Case 16-8255, McCoy v. Louisiana. Mr. Waxman. Mr. Chief Justice, and may it please the Court, when a defendant maintains his innocence and insists on testing the prosecution on its burden of proof, the Constitution prohibits a trial court from permitting the defendant's own lawyer over the defendant's name to tell the jury that he is guilty. The Sixth Amendment guarantees a personal defense that belongs to the accused, and whether to admit or contest guilt is the paradigmatic example of that personal defense, not only because it singularly affects the life and liberty of the accused, but also because making that decision requires weighing subjective aspirations and value judgments that are unique to every individual. Suppose the charge is murder, and the lawyer says, based on what I've looked, I think your best case is self-defense, you know. And the other guy, the defendant, says, no, I didn't shoot the person. And the lawyer says, well, I think the evidence is going to show that you did, self-defense. If the lawyer goes ahead and presents that defense, does that fall under your theory? Mr. Chief Justice, I think your question raises a question both of what defense counsel may constitutionally do and also what defense counsel may not constitutionally do. I'll also note first that your hypothetical, in dramatic contrast to this case, involves at a minimum the shared objective of obtaining an acquittal on the charged crimes. But in addition, our position is that the one thing that counsel in that case and in no case may do is this isn't about what counsel can argue, it's not about what evidence can be introduced, it's that counsel may not stand up and affirmatively vouch, admit that his client is guilty. Now, your example, yes. Roberts, that was a big windup. But my particular question is, obviously, when you say simply that my client shot the guy, that doesn't mean he's guilty. If he did it in self-defense, he's not guilty. And then the defense is it was self-defense. So the defense is he's not guilty. So recognizing that that is not this case, our position is, and I think the Framers utterly would agree, that if a defendant stands up and says, look, I did not shoot that guy, as Mr. McCoy said, I did not kill my own family members, and I do not want my lawyer standing up and telling the jury that I did, that is for the defendant. Roberts, your position is not limited to the situation where the lawyer admits the client's guilt. It goes beyond that. We – that's a hypothetical, and our position is that the Framers, that the meaning of the Sixth Amendment, the meaning of the right to defend that the Framers enshrine, that it is recognized in all common law jurisdictions, is that if the defendant contests and decides to put the prosecution to its proof beyond a reasonable doubt as to an element of the offense, particularly at the actus reus, the Constitution precludes the defense, his own lawyer, from telling the jury that he did it. Roberts, any element of the offense? Do offenses have a lot of – I mean, is venue an element of an offense sometimes? Or – Well, the most extreme hypothetical I can think of is, was there a mailing in interstate commerce? All right. Well, that's a good one. Is that – is that – I mean, the Hobbs Act or something, did you cross State lines? That's an element of the offense. So if a lawyer says, look, it's obvious that you did cross State lines, you've got 48 witnesses, I'm not going to argue that you didn't cross State lines, and the person says that's an element of the offense, you have to say, I didn't, or withdraw. No, no, no. You don't – the client doesn't get to decide what you will affirmatively say. The client can say, even if it's just an element of the offense. Okay. So the lawyer gets up, look, they've got to prove these things, crossing State lines, that's clearly proved, but we want to talk about these other things. So that violates this fundamental right? Just so that you and I are very clear about this, we don't think that this case presents the question, because this is a case in which – in which there was not an agreement on whether to pursue acquittal. This wasn't a disagreement about strategy, about how to be acquitted of murder. And that's a huge difference, and our position in this case only depends on that. But the logic – You know how hypotheticals work. This is a different case, and I just want to make sure that I understand that your position is that the lawyer cannot vouch for any element of the offense, not just that, you know, it was self-defense, not that you didn't shoot him, all that, but any element of an offense, if the lawyer tells the jury that that's satisfied, contrary to the client's wishes, that violates the right. Our position is that the defense that the Framers enshrined in the Sixth Amendment and that is recognized in the entire rest of the common law world is that, whether it's admitting guilt or not, if the defendant says, I did not do X, I did not kill my parent – my family members, defense counsel may not affirmatively tell the jury that he did and ask that he be required to spend the rest of his life in prison. But I did not cross the Pennsylvania State line in the course of conviction. That's right. The defense lawyer doesn't have to say to the jury – he doesn't have to say one word about crossing State lines. What he can't say is, I am telling you that Mr. McCoy killed these three family members. Your answer is that this is fairly simple. The defense attorney cannot concede any element of the offense. If there is a contemporaneous objection, the trial court may not permit the defense lawyer to admit any element of the offense. That's the problem. I mean, that's the problem in my mind. Ferretta itself poses a problem, because a large percentage of the people that insist on reproducing themselves, particularly in death cases, are going to walk right into the death chamber. A lot of the people there are just not really capable of managing their own defense. So now we have a lawyer, and suddenly we come in with a constitutional rule that's going to tell the lawyer how to argue his case. How do I know what you say is true? The people who know this are the trial bar, if anybody. But how do you know whether there are cases where, in fact, to make a sensible defense for this person who might have one, the lawyer has to say to the jury, because of what other witnesses have said and so forth, that letter did cross State lines? And if we agree with you in this, which is a very different case, the argument against agreeing with you in this is it will be like a balloon expanding into we don't know where what, because they're filled with elements, the Federal Code. And before you know it, lawyers will have a hard time defending this person, and you're walking right into jail when you start telling your lawyer how to run his case. Now, that's the concern that I think is there in the Chief's question, and I would like to know your response to what I consider a very practical concern. Waxman, my response, as Your Honor's question noted, is there is no need for this Court to decide the elements question or any other hypothetical in which there is a shared objective of acquittal in order to decide this case. My position with respect to my question is that's surprising, because if we announce that we're not deciding it, there are, like, 200,000 criminal cases in the lower courts, and there will be a kind of chaos. I mean, I fear that as to what — there are lots of people, you know, there are many, many defendants who go through dozens of lawyers while they're objecting to this one or that one or the other one. And you see what I'm worried about? I think we should decide it. Okay. I invite you to decide it. It will be dicta, but I invite you to state what the logic is. And our position is simply this. We are talking about the defense that was enshrined in the Sixth Amendment, and there is no contest from the State about the contemporary understanding of this at the time. But it — But, Mr. Waxman, if we have to draw a line, it seems to me we have at least two axes we have to worry about. One is, where do we stop on the concession? You say it goes down to elements. I press you, why would it go further than that if the client instructs the lawyer not to accede to admission of a piece of evidence is particularly damning, but the lawyer sees no good-faith basis for objecting? So why doesn't it go down to that level? That's one axis. The other axis would be, you say it's — the lawyer can't admit the element. But what if the lawyer casts doubt on the element? I mean, what if the lawyer here hadn't admitted guilt, but had presented a mens rea defense that really cast aspersions on the actus reus defense, right? Really cast it — any reasonable person would know what the lawyer is up to. He didn't use the magic words, I admit, but he did, in fact, essentially do that. So we have ambiguity on both these axes. Where would we draw the lines? So I think this Court has been — as to your first axis, the Court has been very, very clear that decisions — once a defendant chooses to be represented by counsel, decisions about what evidence to admit, what objections to raise, what witnesses to call, with the exception of the defendant, and what witnesses not to call, and what arguments to be made are for the lawyer reviewable, if at all, under the ineffective assistance of counsel defense. So evidence, arguments, witnesses, this case is only about — and you say there's a small difference, but this is all the difference in the world. Sometimes, though, a piece of evidence is far more important than an element. Take the Chief Justice's example of the Hobbs Act. I mean, interstate commerce elements are usually not that big a deal in those cases. But admission of a piece of — a letter, you know, an admission by the defendant is a huge deal. I mean, in the real world, what defendants object to — and I've been representing death row inmates for — this is my 40th year. Defendants are not drawing a line and saying, you can't admit that something moved in interstate commerce or crossed state lines. What they are concerned about, and what they have an autonomy, dignitary right to have protected, is I didn't do this. I didn't commit the actus reus. Ginsburg. If we — if we concede the general proposition that you're right, the client has a right to say, I didn't do it, but that's a defense. And what the client wants to put on, to make out that defense, the lawyer says, I can't present that because you say there are witnesses, I've talked to the witnesses, they say the opposite. I can't put on the defense. So if — we'll take this very case. So the lawyer can't say, my client shot these three people. But then what? What — what — how — how does the lawyer back up that defense, I didn't do it, when in the lawyer's view, there is no basis for taking that position? Justice Ginsburg, the defendants and even clients in civil cases all the time do things that make counsel's job either difficult or impossible. The defendant can say, look, I don't care, I am going to testify and I am going to give my side of the story. Or I don't care, I've instructed all of my family members not to talk to you, not to provide you any information. The lawyer's professional responsibility, nonetheless, is just exactly how Justice White explained it at pages 257 and 258 of his opinion in United States v. Wade. What happens in these cases is the lawyer doesn't have — the principle at stake here is not in any way a restriction on how the lawyer presents evidence, what defenses he actually does present, how he goes about cross-examining witnesses, his obligation. Ginsburg. Can we be concrete about this case? So the lawyer doesn't say to the jury, he did it. The lawyer says nothing. And then the client wants to present this alibi that is inherently incredible. What does the lawyer do? How does the lawyer assist the client in making out the defense that the client has chosen? The lawyer will cross-examine the government's witnesses, as Justice White explained, attempting to find holes in their testimony, even if the lawyer believes that they are testifying truthfully. That is the hallmark of the adversary system. And although it is not this case, because Mr. English testified repeatedly under oath that his client's belief that he was not there and he did not do this was sincere, sincerely reflected his understanding, even if he thought that Mr. McCoy — Mr. McCoy said, look, I was there, but I'm going to get up and say that I wasn't. The ethics rules are very clear about what lawyers can and can't do. None of that is at issue in this case. Sotomayor, this sounds like a — my ethics class in law school, and this very hypothetical of what do you do with a lying client. And it was my understanding that every ethics rule requires the lawyer to put the client on the stand, but not assist the client in telling the lie by — you can put them on the stand and say, tell your story. And if the judge or someone objects that you're — that this person's rambling on, you say to the judge, I cannot ask questions. My client has directed me to put him or her on the stand. People can walk themselves into jail. They can walk themselves, regrettably, into the gas chamber, but they have a right to tell their story. They have — they have the — I mean, Your Honor's understanding, this is not a question  Absolutely not. But Your Honor's understanding is correct as to the vast majority of jurisdictions. Mr. Waxman, could I ask you about — because I want to understand where the line is here. So let's imagine a case where the evidence of the actus reus is overwhelming. There's not a chance in the world that the defense is going to be able to convince a jury that the defendant did not commit the actus reus. But there's a plausible defense, maybe a pretty good defense, on mens rea. So — but the client insists, I didn't do it, I did not commit the actus reus. Now, two ways of approaching this on the part of the defendant, defense attorney, and I want you to explain whether one is required or whether — whether both are permissible or only one is permissible. One is for the attorney to concede in the opening, yes, he committed the actus reus, but there's a good mens rea defense, and develop that. I take it you would say that's not permissible. Correct. But could the attorney open by saying, now, they have to prove he committed certain acts, but also that he had a certain mental state. And our defense here is going to be that he didn't have the requisite mental state. And everything that's done during the trial is directed toward that. There's no attempt to put the government to its proof to try to poke holes in the witnesses who are going to be called to establish the actus reus. Is the latter permitted? So the latter — So long as he doesn't say the magic words, he actually committed the — the physical acts charged, it's okay? Right. The core — it may or may not be okay. Let me be very clear about this. The core Sixth Amendment right that is at issue here is where a defendant says, this is a personal defense, I can make my own value judgments about whether I do or do not want to take a minuscule chance of not being convicted and spending a life in prison. The Sixth Amendment prohibits the lawyer from affirmatively telling the jury, I'm telling you he is guilty and he should spend the rest of his life. That's the right at issue here. And your — and that would — I understand your position, but what is the answer? I want to understand where the line is. What is the answer to my question? Yes. The answer to your question is, if I understood your hypothetical correctly, there would not be a violation of this fundamental Sixth Amendment right and the defense counsel's strategy in focusing the jury on mens rea and saying nothing or cross-examining or not would be evaluated under the ineffectiveness of counsel standards. Excuse me, Mr. Waxman, can you — Mr. Waxman, can you — That's true, that's true, even if — Justice Sotomayor will have the next question and I'll have the next one. That's true even if the accused says, I want you to say that I didn't do it. The lawyer does not have to do that, right? That's your position? Our position is that the law — Yes or no, please. You're — the lawyer does not go in and say the client did it. The client says, I want you to say I didn't do it. That's a very clever defense you have on mens rea, but I want you to say I didn't do it, and the lawyer says I'm not going to do that. I believe that the lawyer does not have to do that. Okay. But the law — this is only a prohibition. Justice Sotomayor. Taking Justice Alito's hypothetical, I walk in and say it is the government's burden to prove this case beyond a reasonable doubt. It means that they have to prove each and every element of the offense, the actus reis, the mens rea, whatever other important element there is. If the government were to prove every other element in this case beyond a reasonable doubt, the one they can't prove is that the person who shot this person did it with the right mens rea, that would be okay. It hasn't conceded the person committed the elements, and it's saying I'm putting your focus just on mens rea, right? So I'm — my — you know, the government alleges all these things. Ladies and gentlemen of the jury, it is going to be required to prove each and every element to your satisfaction beyond a reasonable doubt. I am going to introduce evidence in this case that is going to convince you that even if you find that the defendant committed these murders, he did not act with the requisite mens rea. Breyer. That's easy for you to say in a case that you are imagining. What I'm wondering, if there are other cases where it might be far more difficult to come up with that answer, and therefore I'm asking you this question, suppose the opinion were to say, in this case, the lawyer explicitly said to the jury he is guilty of the crime charged. That the Sixth Amendment forbids. But the rest of these complicated matters, whether it's elements, whether it's this, whether it's that, we leave, at least for now, we leave to the law schools, the bars, the ethics classes, and the others, because we don't want to freeze the answer into the Sixth Amendment. Now, what would you think of that? Waxman. I think that the only holding that this Court can apply in this case is that under the statement of the case, which is where the defendant says and says to the judge promptly and repeatedly, I did not kill the members of my family, my lawyer wants  me to tell the jury that I did and that I am guilty, and if the judge says, you're the lawyer, you decide, that is a violation of the Sixth Amendment process clause.  Kagan. Mr. Waxman, can I take you back to the Chief Justice's question, because here we do have a case where the defendant is saying, you can't admit the actus reius, which is killing.  But there are different levels of generality, right? One is you can't say that I didn't kill my family. One is you can't say that I committed the actus reius, no matter what the actus reius is. And another is you can't say that I committed any element of the offense, actus reius or otherwise. And if I understood your argument, you're saying that the logic of your position takes you from this case, which is an actus reius of killing, to any actus reius, and then further from there to any element. And I guess I wonder, why is it that the logic of your position insists that we go up that chain? I don't think the logic of my position insists that you go all the way up the chain, but I'll explain to you why I think the better view would stop at affirmatively admitting, nothing about what the trial — how the trial is conducted, but affirmatively admitting any element. And it simply goes back to my reading and my understanding, maybe I'm wrong, of the rule that existed, the law that existed at the time the Sixth Amendment was considered and adopted, and what the framers must have understood. And we go over this at some length in our brief. There's no controversy about this. I think that at the time, in the 18th century, in England and common law jurisdictions, and at the time of the framing of the Sixth Amendment, the frame — people would have been astonished, as the amicus brief of the Bar of England and Wales expresses that the notion that the defendant could say, this is my defense and my decision to contest this invokes my own subjective judgments about what is important to me and what is not important to me, that it would be — they would be astonished to hear that in that circumstance, defense counsel could stand up and say — Roberts, Mr. Waxman, I think you're right about that, but my question would be — I'm sorry. No, go ahead. No, no, no, I'll — on that, it seems to me that that's Furetta, right, that you have a right to control your self-representation if you're unhappy with your lawyer. Your client had an opportunity to — he's on his second lawyer, and he had noticed before trial that there was a breakdown with his lawyer. And the trial court ruled he came too late to replace him with a third lawyer yet or to go to self-representation. Why isn't this just an untimely Furetta problem? Accepting everything you've said about the original understanding, at some point one can waive these rights, too. These are personal rights that could be waived. There's no question about it, but the right to the assistance of counsel and the right to your defense are not mutually exclusive rights. Justice Alito, and then if I may, I'd like to save some time for rebuttal. Well, in — when the Sixth Amendment was adopted, there was not a right to appoint a counsel. So I imagine somebody in Mr. English's position would simply say, I'm not going to be part of this farce that you want to put on, I'm just withdrawing. And Mr. McCoy would be — would either have to come up with another attorney very quickly or go ahead without an attorney. So I don't know how much you can read into the — into the original understanding, because the situation here is dictated — is dominated by the fact that now there is the right to have an appointed attorney. Justice Alito, Daniel Webster himself could not constitutionally have done what Mr. English did in this case, and I don't think there would be any doubt in the Framer's mind about that. If I may, may I reserve the balance of my time? Certainly. Thank you. Ms. Merrill. Thank you, Mr. Chief Justice, and may it please the Court. The State proposes a rule that in a narrow class of death penalty cases, counsel sometimes might be required to override his client on a trial strategy when the strategy that the client wants counsel to pursue is a futile charade and requires him to defeat both their objectives of defeating the death penalty. We submit that that should be treated as a strickland ineffective assistance of counsel. I'm sorry. You started by saying you want a narrow rule. Why is it narrow? It seems to me that it's a rule that you're saying is absolute. Why does it have to be just in death penalty cases? Your Honor — How do you limit your — why would we limit your rule? Because I think we've conceded and we would — we would agree that in most cases that the rules of professional conduct would dictate that a lawyer follow the directives of his client. Is it the rules of professional conduct or is it the Sixth Amendment? The Sixth Amendment requires you to be represented by counsel, effective counsel, but counsel. Would you concede that generally or all the time — let's not say this is a death case, let's just say this was a robbery case, all right? Robbery case. Defendant says, I wasn't the robber. Can the lawyer come in and do what Mr. English did? Yes, he was the robber, but no, he didn't intend to force, to use force. I think that the rules of professional conduct inform the Sixth Amendment and that they would probably give some level of greater force to the client's wishes in certain situations. But again, I think that goes back to Strickland. It's an — if you evaluate it as a Strickland claim, then we're looking at it under the first prong of Strickland as a question of position. So you don't think it's a Sixth Amendment violation? I do not. I think it's an ineffective assistance claim, and you have not proven that. Sotomayor, so you're not taking the position when you're saying generally that a client has any right to say, I didn't do this in court? I didn't do — I didn't shoot, I didn't rob, I didn't make that call that that witness says I made, that the witness — that a client, once he takes a lawyer, takes — doesn't have a right to say, I didn't do it at all. I think we wouldn't characterize it as an independent autonomy right. We believe that it is a shared relationship inside the attorney-client relationship when he has counsel. One of my former colleagues said this isn't — one must analogize these things to agency, that the defendant, the lawyer is the agent of the defendant, and once they disagree, the agency ends. Yes, Your Honor. So if the agency has ended because the client has said, don't do this, how can it not be a violation of the Sixth Amendment to do it? Because agency principles only take us so far, and because even the ABA standards on criminal defense standards don't suggest that they do, that agency principles, especially in a death penalty case, can only take you so far, and that if we — if we look at this purely as a question of agency, then we are viewing the lawyer's relationship simply as the alter ego of the client. Breyer, I see your point. Normally, these are questions of the bar rules, of rules of ethics for lawyers and so forth, and normally they do what the client says. That's the normal situation. Right here, it was pretty clear that on the most major matter in respect to the trial, he did the opposite and said his client was guilty. So why didn't this work out just the way you said? Why didn't the defendant say it violates the ethics rules, that it was, therefore, ineffective, therefore give me a new trial? Your Honor, I think this was a very, very difficult client, and that that is part of the equation in this case. But the ethics rules say it's all different when you have a difficult client? Maybe many are difficult. The ethics rules don't tell us what to do. But, no, but you just said the ethics rules say follow the wishes of your client. I mean, that's what's worrying me, obviously, in fact, about the case is the extent to which it's fed into the Sixth Amendment, because there are so many different situations. But if anything is fed into the Sixth Amendment, I would think the example of the lawyer going in against his wishes and saying he is guilty of the crime charge, which is basically what happened, that that might or must. Well, Your Honor, I mean, I think the State has been very clear that we think that the defense that Mr. McCoy wanted was inextricably intertwined with the alibi that Mr. McCoy wanted, that it was not purely a question of the lawyer. They are not saying about what you have to put on or not put on. They are just saying the Sixth Amendment says you can't go to the jury and say, as this lawyer did, my client is guilty of the crime charge. Now, that's the extreme case that's put to us. Now, why doesn't that violate the Sixth Amendment? Because at the end of the day, it leaves him with a less, less of a defense, a less the defense is not as strong, it is a weaker defense. He has not waived his right to counsel. He hasn't waived the remedy of ineffective assistance of counsel. And so he's at he is tying his counsel's hands. Kagan. Kagan. Well, for sure, we've given lawyers a lot of leeway to make quite a number of decisions when they're representing a defendant, troubled and untroubled. And the idea is that lawyers know better sometimes than their clients and that we should want to lodge a great many strategic decisions in their hands rather than in the client's. But you're not talking about here, or we're not talking about here, about how to pursue a set of objectives. Is it better to pursue it this way or is it better to pursue it that way? We're talking about a client saying, you have to follow – I have an overriding objective in this case, and that's to avoid the opprobrium that comes with admitting that I killed family members. And that's my overriding objective. And you're saying that the lawyer can say it doesn't matter that that's your overriding objective. And I guess what I want to know is why. Well, because, First Your Honor, I don't think that that's entirely how Mr. McCoy characterized his objective. I would describe it more as though he said, I know a better way to cross this divide, and we're going to cross it by letting me drive this car over the cliff because the car will fly. But he didn't say that. He said, and I think this much is clear from the record, he said, in no uncertain terms, I do not want to concede that I killed these three people. He wasn't talking about strategy. He just said, I do not want to concede that I killed these people. I think we've heard that from Mr. Waxman, a lawyer can't make that concession. But the lawyer doesn't have to do anything else. They can just stand there and let the client get on the stand and tell whatever story the client wants to tell. No, Your Honor, I mean, I don't think that we – I think that the problem that that presents is that the lawyer is now less effective than he could be, especially in a case like this, when – and we will – I will give Mr. English the opportunity to say that he did not believe that his client was going to lie, and yet he believed the alibi was entirely falsified. So he – giving him the benefit of the doubt, he believed his client was delusional, and so that does bring into play other rules of ethics. It doesn't really give him the answer of what to do and how to do it, but his ultimate objective, his ultimate objective is to try and do the right thing for his client to defeat the death penalty and to save his life. But the client is saying that his ultimate objective is not to defeat the death penalty. In other words, you just have conflicting objectives. I mean, I totally understand that this lawyer was in a terrible position because this lawyer wants to defeat the death penalty, and he has a client who says, that's not my goal here. But the question is, when that happens, does the lawyer have to step back and say, you know what? That's not his goal. His goal is to avoid admitting that he killed his family members. Well, and so if that's all he had said, and that was the totality of the circumstances, was, I don't want to admit that, and it was a rational, fine discussion, I don't want to admit that, I don't want everybody to hear that, that's fine. That's not what happened. We got to this – the situation here occurred. It's an extreme situation and a difficult one, but it only occurred because of a number of prior steps, many of which I think are debatable. One, the decision that McCoy is competent to stand trial. The second, the judge's ruling, and I understand the reason, that English couldn't withdraw. The decision that there couldn't be a continuance so that McCoy could find another attorney, if he could find one, who would put on his far-fetched alibi defense. And McCoy's refusal to waive his right to counsel and represent himself. Now, if any of those had gone differently, the situation wouldn't have been presented. So what about the issue of competence and allowing English to withdraw? If somebody like McCoy really sincerely believes that he did not commit these physical acts, but it was all done by – as part of an elaborate conspiracy, is he – is he capable of assisting in his own defense? Your Honor, that's a very difficult question. I agree it's a very tough question, and I think it is a question and tension in this case, but it's not the question that was presented. And so the question is really about competence. Ginsburg. Wasn't there a motion – there was a determination that he was competent to stand trial? There was a determination that he was competent. There was a subsequent review of that determination on the motion for a new trial by the trial judge, and there was a third review of that decision by the Louisiana Supreme Court. The lawyer put on a defense. I could just move on to the other part of it. So if English says to the judge, look, Your Honor, I can't be part of – and I don't want to be part of this farce, and this farce that has the predictable result of sending this – my client to a death sentence. I want to withdraw. Why shouldn't the judge let him withdraw? Perhaps he should at a certain point in time, but I think that's a limited right in and of itself, and that the judge has to make that decision based on an abusive – and that's an abuse of discretion standard. And that was raised in this case, too. So, I mean, maybe that would have been an answer. I think it has to happen at the right time and under the right circumstance. Would the lawyer – did his lawyer put on a defense? He conceded that he – he didn't fight the competence, but did he put on a defense that the defendant was not competent at the time of the murder, that his – that his mental state was such that he couldn't be convicted? The entire tenor of his defense was to attack Menz Rhea and then subsequently to beg for mercy and the penalty. To attack Menz Rhea on the ground that it was not – he was not mentally competent at that time? Yes, Your Honor, that he didn't have the capacity to develop a specific intent. Counsel, you've been asking us to review this under Strickland, but why isn't this a structural error? The Sixth Amendment guarantees the assistance of counsel, as Mr. Waxman points out, and that is a fiduciary relationship. And when someone doesn't just admit an element but admits guilt of second-degree murder, which is effectively what happened here, why isn't that structural error a total denial of assistance of counsel, absence of an assistance of counsel, that we should take cognizance of and draw the line there? Your Honor, but first of all, because I don't think it fits within the class of cases that have been evaluated as chronic to complete failure of adversarial testing. Well, why isn't this just like Ferretta, where we said, you know, that you have a right to have assistance of counsel and not to have an agent of the State assist the State in prosecuting you? Well, initially, because I would suggest to you it was not a – he was not an agent of the State. He was Mr. McCoy's counsel of choice. You'd agree, though, that he effectively conceded guilt of second-degree murder? As a strategy and a means of defeating the death penalty and testing the State's case on specific intent. I'm sorry. I thought it's been not disputed that he thought, quite wrongly, that there was no mens rea for second-degree murder, but that it's been conceded that there was no men's rea for second-degree murder, but that there was a mens rea both for first and second degree, and he was only arguing for second-degree. Your Honor, in the facts of this case, he was arguing for second-degree. Louisiana law does permit, does cover – felony murder is not a specific intent to kill, but that was really never at issue in this case. It was charged as a second-degree murder. I'm sorry, but there is a mens rea for second-degree murder. There is, yes. And so you can see that there was a second-degree. I think that that was a strategy decision that falls under the first prong of Strickland. And if that was, in fact, the wrong decision, then it was still would fail potentially the first prong of Strickland, and then we would go to the second. But I think that does go back to Strickland, and most of – all of the questions about how he did, what he did, and the choices that he made ultimately, I think, fall under the first prong. And that's – I now understand why we are where we are, that in this case, he did not, the lawyer, concede that his client was guilty of the crime charged. Rather, he said he conceded that he had shot the people or killed the people, but he's not guilty because of his state of mind. So it's a question of the defense. That's why he started with elements and so forth. You have to go down some road like that. Yes. All right. And so your view is that even here, where he's saying, I did this thing, but I didn't have the mental element, I did this thing, the client says, don't say I did this thing, and that's the problem. And okay, I've got the problem. I'm sorry I should have it before now, but the question is, what is the problem? Justice Breyer, I think that you captured where the State is when you said, let's don't freeze that answer into the Sixth Amendment. Well, what's your – that's fine to say in abstract terms, but our problem, I think, at least mine, is I have to write something here that is going to be taken as a rather authoritative account. Now, what is your view as to what those words should be, that he can do anything, the lawyer, no matter how incriminating it is to the client, as long as he says, I want to follow a different defense, a different defense than my client wants. That's your view of it. And leave the rest to the Strickland, the Bar Association, et cetera. Is that your view? What is your view, if you can say it in a sentence or two? That in a very narrow class of death penalty cases, counsel may be required to override the decision of his client if that's – if the client's strategy is futile and – If we're there, though, in Strickland, even in Strickland rule, on deficient performance here, by the lawyer admitting the element, as opposed to remaining mute about it. That would have been an option that I think the lawyer could have pursued. So we'd still have prejudice pronged, I understand your arguments there, but why not on deficient performance? I would have thought under the ethical rules, which I know are not controlling here, that you would have had an argument for an ethical violation in conceding your client's guilt. And I would expect them to make that argument. They've reserved their Strickland claims. They reserved them before the Louisiana Supreme Court. They can bring those claims in subsequent post-conviction review proceedings, and they have expressly reserved them in their proceedings here. So I would suggest that it would not be appropriate to pretermit that inquiry, that a State court should make that decision, and that those are factual findings that need to be made. Ginsburg. If this is a case that comes under chronic, if it's a chronic case, as Mr. Waxman urged, that it is, then there's no Strickland analysis, there's no prejudice inquiry, it's just automatic new trial, because the Sixth Amendment right is violated. And so, Justice Ginsburg, I would suggest that the Sixth Amendment is not violated until, if it is a Strickland question, which we submit that it is, the Sixth Amendment isn't violated until he has demonstrated both wrongs. Ginsburg. But why isn't it a chronic question? This is a lawyer who has said, I concede my client did it, against the client's will, made that concession. Why isn't that a chronic error? Because I think it's not a complete failure of adversarial testing, and that it fundamentally tested the State's case. It did not relieve the State of its burden of proof. The State put on overwhelming evidence of this man's guilt. What about it? Can I put in my notes in this case, can I take away from your argument, that the State of Louisiana says that if a defendant wants to plead not guilty, the defense attorney can plead guilty if the defense attorney thinks that's the best way to avoid the death penalty? No, Your Honor. Because you do not agree with that proposition. I do not agree with that proposition. How is that proposition any different from what really happened in this case? Because the State was still put to its burden of proof. Because I think that in Florida v. Nixon, this Court did evaluate the nature of the defense itself, and that it is not the equivalent of a guilty plea. So he didn't change the guilty plea. He tested the State's case. And he, he, he, I mean, he didn't. I thought he said, I'm relieving the prosecutor of that burden. He made that statement. He did make that statement in his closing arguments. But he couldn't actually do it. He had no power to relieve the State of its burden. Maybe this is the same question Justice Kennedy was getting at. But what if there was a discussion before and the client told the lawyer, I understand you think you're doing your job keeping me from the death sentence, but I don't want, it's worse for me to spend the rest of my life in jail. That's my perspective. So I don't want you to pursue your objective of saving the death penalty. Instead, I've got this, and so if that's not the case, I don't want to make it an easier case on second degree. Our only chance is to defeat first-degree murder, and here's how I'm going to do it. So you cannot stand up and say that he's, he's guilty, because that's just getting me life in prison, and that's worse. And the lawyer, does the lawyer then still have the, the right to pursue his strategy? Still has the right to say, yes, I'm going to tell you he's guilty, but he doesn't have the mens rea? I think, and I think in that situation, you probably are going to fail the deficiency prong of Strickland and probably the prejudice prong, and, and you are, in your hypothetical, talking about a rational conversation with someone who's cooperative. I mean, that's not correct on this case. Mr. McCoy simply said, I won't talk to you anymore, I want my alibi, I want to subpoena David Vitter, Senator David Vitter, and, and put on all this crazy stuff, and, and I can, I can prove that I wasn't, that I wasn't used to it. So the further footnote is, it's, only happens if your client's not rational? That that's where you have the freedom to ignore your client? No, Your Honor. I think that, I think that our rule, by placing it under Strickland, falls within the, the, the, the principles that have been applied by State courts over and over again, that you look at the totality of the circumstances, that the rules of ethics and norms of practice do inform counsel's judgment, and that in most cases, you would validate the decision of the client. Kagan. Ms. Murrow, I, I think all these questions go to the same point, which is Strickland seems a very awkward fit here, because there's nothing wrong with what this lawyer did if the goal is avoiding the death penalty. This lawyer probably did the best thing, the thing that a good lawyer would do if the goal were avoiding the death penalty. The problem that this case presents is something different. It's the lawyer's substitution of his goal of avoiding the death penalty for the client's goal. As the Chief Justice said, I don't care about that. I don't want to avoid the death penalty. I, I, that's not my paramount goal. My paramount goal is to insist till my last breath that I didn't kill my family members. Well, Justice Kagan, I think the record reflects that's not, that what Mr. McCoy wanted was to defeat the death penalty by the means that he wanted, which was his alibi. So I. Well, let's take Justice Kagan's hypothetical, then, on its own terms. What would be the outcome in that case? I, I think that probably to some degree goes back to Justice Roberts' hypothetical about a rational conversation with a defendant who was willing to have a conversation and not simply close the door to the discussion, which, which is much more like the defendant in Dixon. Yes, let's posit all of that, that we have a competent, rational, thoughtful individual who makes a calculated decision autonomously, that that's the route he or she wishes to go. Is it, can we even call it assistance of counsel? Is that what it is when a lawyer overrides that person's wishes? I, I do believe it still falls within assistance of counsel. And I, I think that that is answered by the deficiency prong and the norms of practice. And it's the totality of the circumstances. And he would probably win that. Did, did, I'm thinking back, I think the Chief asked you, or maybe it was Justice Kennedy, he quoted the language where he said, I've relieved you of your burden. So he says, I've relieved you of your burden, he says to the jury, and he also says, and he's guilty, that was earlier. Now, in the context, was that, you're familiar with the record, all right, was that in fact an admission that he committed a crime, namely, first-degree murder or second-degree murder, or both? Or are you saying, no, it was not an admission, because, if it was not an admission, then why didn't he tell the jury, but you see, he had a mental state that makes it impossible for you to convict, or did he? He did. He did tell the jury. He said you cannot convict because he has a mental state that prevents you from committing a second-degree murder. He argued that consistently from start to finish. And he put, and his closing statement said that, too? Yes. Okay. I'm sorry. I thought, I'll go back to it, but I thought the essence of his closing statement was he's not deserving of the death penalty because, as you heard him, he's a sick man. It, it, the, the, the specific words that he used, the totality of his defense from start to finish, was that he did not have the mens rea necessary to support the death penalty, the first-degree charge. And that was the gist of it. There's some creep in his arguments over time. I, the words are there on the page. But I would submit to you, again, that is argument, and that that is a deficiency question under Strickland, that that is always, argument has always been a question of deficiency under, under Strickland. That's not a new proposition. So I, I think that if we're, we, he's still, and I would submit, we should go back and look at what happened with the court, and, and that, that ultimately, to my very able friends to the left of me, this was not a court error. This was a counsel decision, and the court and the prosecutor went over, bent over backwards to try and protect this record. There was very little more that they could do to protect the record once trial had started, once they were at the point where they were choosing a jury. So, so I think that it was a very, very complicated situation, and that when we get to that point, then it needs to be a Strickland question, because it is too hard. Ginsburg. And when you say Strickland question, the, the client says, I didn't do it, and I have a right to take that position. You agree that the client has a right to take that position? Certainly, Your Honor. I think the client can take that position. So the, the client can do that, and the client can say, when my lawyer tells you that I did it, he has violated my privilege against self-incrimination. He has incriminated me. He has said I've done something that I haven't conceded that I've done. What's happened to my Fifth Amendment privilege? Justice Ginsburg, I think that the Fifth Amendment could be implicated in certain factual scenarios. I think in this particular case, what we saw were a, a repeated, consistent sequence of waivers of the Fifth Amendment, so that everything he said was already in the record, that he had repeatedly put this information with his alibi statements and his statements in the court, where the court continued to read him his rights over and over and over again. And, and so all of this information was in the record, and now counsel has to cope with it, and that was part of the problem, too. So it, it, it is a, a situation where you certainly had a very difficult client. You had a death penalty case. We are very near the two days before trial, and that's where we are suggesting you draw the line and treat it as an ineffective assistance of counsel claim. But not that it doesn't implicate other rights, potentially, depending on what happens. Robertson, Thank you, counsel. Three minutes, Mr. Waxman. Waxman I know I'll never do this, so I'll try to make five points. First, Justice Gorsuch, this is structural error. The fact of the matter is that this was presented to the trial court, not once, but twice, on the record, that what the defendant was asking for is, I don't want my lawyer to admit that I am guilty. And the trial court's ruling in this case made that structural error and not ineffective, it's not properly viewed as ineffective assistance of counsel, just as in Gonzalez-Lopez and in Ferretta it was structural error. Second, the notion that what Mr. McCoy was asking for was not that his lawyer not stand up and admit that he was guilty, but that he, he insists on putting on an alibi defense is simply refuted by the record at page 398 of the Joint Appendix. This is during an argument in six months before the trial. The argument was all about whether his, Mr. McCoy's subpoenas had to be enforced or not, and whether Mr. English should be supporting him. Mr. McCoy tells the court, I am not asking him to validate any theory. This would be, there was a dispute about whether Mr. English was in fact investigating his alibi defense. If there ever were a subsequent hearing about that, that would be tested. But this is flat out a case in which the judge was told, as soon as this issue arose, twice on the record, I believe that I have an ethical duty to save my client's I do not want my lawyer admitting that I am guilty. That's structural error. Number two, Justice Breyer, this was absolutely an admission of the guilt on the charged crime. At opening and at closing, Mr. English got up and said, I am telling you he is guilty of second-degree murder, and he should spend the rest of his life in prison. And under Louisiana law, the jury was required to be given the choice, the following choices, which it was, murder one, murder two, manslaughter, and not guilty. And there is no dispute in the record that murder one, murder two, and manslaughter all have exactly the same mens rea defense as murder one. That is not what distinguishes those crimes. As to chronic, as we've said, we don't think you can finish your third point. As to chronic, we don't think this is an ineffective assistance of counsel case, but it surely is chronic if it were, because if the constitutional right to defend means anything, it means the right to decide to test the prosecution on its burden of proof beyond a reasonable doubt. Thank you, counsel. The case is submitted.